1  WO

2

3

4

5

6

7              IN THE UNITED STATES DISTRICT COURT

8                FOR THE DISTRICT OF ARIZONA

9

10

11

12  KAREN SAMPLES,                    )
                                      )   No. CIV 05-2028 PHX RCB
13              Plaintiff,            )
                                      )        O R D E R
14         vs.                        )
                                      )
15  FIRST HEALTH GROUP CORP., et      )
    al.,                              )
16                                    )
                Defendants.           )
17  _____ )

18      This matter arises out of an action brought pursuant to the

19  Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §

20  1132, by Plaintiff Karen Samples to challenge the rejection of her

21  claim for additional director-level severance benefits under the

22  First Health Group Corp. Severance Pay Plan (the "Plan") following

23  her termination through a reduction in work force.  After her

24  denial of benefits, and an unsuccessful appeal, Plaintiff filed a

25  Complaint (doc. # 1) on July 8, 2005 against Defendants First

26  Health Group Corp., its subsidiary companies (collectively, "First

27  Health"), and the Plan.  Currently before the Court is Defendants'

28  motion for summary judgment (doc. # 23).  The motion has been fully

1   briefed.   Resp. (doc. # 25); Reply (doc. # 29).   The Court finds
2   the matter suitable for decision without oral argument.   Having
3   carefully considered the arguments raised by the parties' briefs,
4   the Court now rules.

5   **I.   BACKGROUND**

6       **A. Undisputed Facts**

7       Plaintiff began her employment with First Health on October 4,
8   1999 as its "Clinical Management Services, Colleague Development
9   Director."   Defs.' Statement of Facts ("DSOF") (doc. # 24) ¶ 3.   On
10  January 19, 2004, First Health notified Plaintiff that her position
11  was being eliminated effective March 18, 2004 due to a reduction in
12  work force.   Id. ¶ 4.   The letter also informed Plaintiff that,
13  pursuant to the company's then existing severance pay plan, she
14  would be eligible for four weeks of severance pay.   Id.

15      **1. The Plan**

16      On February 16, 2004, First Health notified Plaintiff that it
17  had organized and consolidated a number of its benefit plans,
18  including the aforementioned severance plan.   As modified, the Plan
19  provides for the possibility of additional severance benefits
20  subject to the eligibility requirement that the departing employee
21  execute a release agreement.[1]   Id.; Pl.'s Statement of Facts
22  ("PSOF") (doc. # 26) at 2.

23      The schedule of benefits under the Plan provides as follows
24  for "persons with the title of Manager or titles below Manager:"

25  _____

26      [1] For eligibility under the Plan, departing employees must "sign
    a Separation Agreement and General Release with the Company
27  including, in some cases at the discretion of the Company,
    restrictive covenants in a form satisfactory to the Company."   DSOF
28  (doc. # 24), Ex. 2 at 2.

                    i. Minimum severance payment will be four (4)
                    Weeks of Pay;

                    ii. Severance pay will be two Weeks of Pay plus
                    (Year(s) of Service times one Week of Pay);

                    iii. Maximum severance pay will be fifteen (15)
                    Weeks of Pay.

DSOF (doc. # 24), Ex. 2 at 4.  For "persons with the title of

Director or titles above Director," the Plan provides the following

benefits:

                    i. Minimum severance payment will be eight (8)
                    Weeks of Pay;

                    ii. Severance pay will be 4 Weeks of Pay plus
                    (Year(s) of Service times 2 Weeks of Pay);

                    iii. Maximum severance pay will be fifteen (17)
                    Weeks of Pay.

Id. at 5.  An explanatory footnote clarifies that the phrase

"persons with the title of Director or titles above Director"

excludes "any position classified as 'non-supervisor' in the

Colleague Data Base, such as Medical Director, National Sales

Director, or Product Director."  Id. at 5, n.1.

     As the administrator and fiduciary of the Plan, First Health

retains the "sole, absolute discretion over issues or

determinations, regardless of the timing of such determination or

exercise of discretion."  Id. at 6.  The Plan further provides that

                    The Plan Administrator shall have the
                    discretion to make any findings of fact needed
                    in the administration of the Plan and will have
                    the discretion to interpret or construe
                    ambiguous, unclear or implied (but omitted)
                    terms in any fashion it deems to be appropriate
                    in its sole judgment.  The validity of any such
                    findings of fact, interpretation, construction
                    or decision will not be given a de novo review
                    if challenged in Court, by arbitration or any
                    other forum and will be upheld unless clearly

1
2
3
4
5
6

> arbitrary and capricious. . . .  If, due to
> errors in drafting, any Plan provision does not
> accurately reflect its intended meaning, as
> demonstrated by consistent interpretations or
> other evidence of intent, or as determined by
> the Plan Administrator in its sole and
> exclusive judgment, the provision will be
> considered ambiguous and will be interpreted by
> the Plan Administrator in a fashion consistent
> with its intent, as determined by the Plan
> Administrator in its sole discretion.

7  Id.

8  **2. Eligibility Determination Regarding Director-Level Benefits**

9     In the Colleague Data Base, Plaintiff's former position is

10 reflected with the title of "director," appearing as "CMS Colleague

11 Dev Dir."  DSOF (doc. # 24), Ex. 7 at 3.  The supervisory level

12 classification corresponding to that position is "Mgr" (for

13 "manager"), as opposed to "Non-Supv" (for "non-supervisor").  Id.

14 The supervisory level classifications for the Medical Director,

15 National Sales Director, and Product Director positions that are

16 referred to in the Plan are also indicated as "Mgr," not "Non-

17 Supv."  Id.

18    On March 8, 2004, Plaintiff received a memorandum from Iris

19 Sullivan, First Health's Director of Human Resources, summarizing

20 First Health's decision to terminate Plaintiff's position and

21 reviewing the recent changes to the company's severance benefit

22 plan.  DSOF (doc. # 24) ¶ 13.  Enclosed with the memorandum were

23 two copies of the Separation and General Release agreement required

24 for eligibility under the new Plan.  Id.  The memorandum further

25 explained that, while Plaintiff would still be entitled to a

26 severance package that was presented to her on January 8, 2004, she

27 would have to sign and return the release agreement within 45 days

28 to be eligible for any additional severance benefits under the new

1   Plan.  Id. ¶¶ 13-14.

2       On March 18, 2004, the last day of her employment, Plaintiff

3   sent an email to Nancy Zambon, First Health's Vice President of

4   Human Resources, complaining about the information she received

5   from Sullivan who told her that she would not be eligible for

6   director-level compensation under the new Plan due to her title and

7   grade of employment.  Id. ¶ 15.

8       On March 19, 2004, First Health issued a check made payable to

9   Plaintiff that included $5,931.20 of severance pay, calculated at

10  Plaintiff's wage rate of $37 per hour, i.e., four weeks of pay.

11  Id. ¶ 16.

12      On April 14, 2004, Plaintiff wrote a letter to Zambon

13  reiterating her demand for director-level benefits under the Plan,

14  and requesting additional time to sign the release.  Id. ¶ 17.

15      Plaintiff eventually retained counsel and formally appealed

16  First Health's decision to its Corporate Severance Plan Review

17  Committee (the "Committee"), which responded by letter dated

18  January 12, 2005.  Id. ¶ 18.  The Committee determined that

19  Plaintiff was not eligible for director-level benefits under the

20  Plan, explaining that "[t]he Plan language indicates the intent to

21  differentiate between the level of benefits awarded to a person

22  acting at a director level with a director title and someone who

23  merely has the word 'director' in their title."  DSOF (doc. # 24),

24  Ex. 11.  The Committee stated that "Footnote 1 to Section 5©) of

25  the Plan clearly provides that the classification in the Colleague

26  Data Base is the controlling classification for determining which

27  Schedule of Benefits applies when a colleague is eligible for

28  severance benefits."  Id.  Finally, the Committee's letter

1    explained some distinctions that it apparently considered in
2    distinguishing between those "acting at a director level" and those
3    "who merely have the word 'director' in their title."  These
4    considerations included the fact that (1) directors accrue Flexible
5    Time Off at a slightly higher rate than other colleagues, (2)
6    directors are required to sign an insider trading agreement, and
7    (3) directors are subject to blackout periods during which they
8    cannot buy or sell First Health stock.  Id.

9        **B. Disputed Facts**

10        Plaintiff states that, during her employment, First Health
11   never explained to her that she was a manager and never showed her
12   the Colleague Data Base on which it has apparently relied in making
13   its benefit eligibility determination.  PSOF (doc. # 26) ¶2.  She
14   claims that, in her position as Colleague Development Director, she
15   exercised supervisory responsibilities over her unit's budget,
16   staff, processes, and procedures, and had eight employees reporting
17   to her.  Id. ¶ 5.  In addition, she states that she attended
18   director-level meetings, was responsible for strategic and long-
19   term planning, recommended who would receive stock options and the
20   number of options to be awarded, and, unlike managers who worked in
21   cubicles, worked in an office with a view.  Id. ¶¶ 6-9.  First
22   Health does not dispute these facts, but maintains that it is
23   irrelevant whether potential plan beneficiaries can see the
24   Colleague Data Base or exercise any seemingly supervisory
25   responsibilities, because the Plan vests "sole and absolute
26   discretion" in the Plan Administrator to make benefit eligibility
27   determinations.  Defs.' Supplemental Statement of Facts ("DSSOF")
28   (doc. # 30) ¶¶ 2, 5.

1    In her affidavit, Plaintiff also states that Sullivan, First
2    Health's Director of Human Resources, initially told her that she
3    thought Plaintiff had been incorrectly classified as a manager,
4    rather than a director, for purposes of severance benefits under
5    the Plan.  PSOF (doc. # 26) ¶ 11.  She states that Sullivan had
6    said that she should receive director-level benefits.  <u>Id.</u> ¶ 12.
7    First Health apparently believes that these statements are
8    contradictory to Plaintiff's deposition testimony that Sullivan had
9    told her that she felt First Health had misapplied the plan, and
10   that she felt Plaintiff was actually eligible for director-level
11   benefits.[2]  DSSOF (doc. # 30) ¶¶ 7-8.  First Health also believes
12   that Sullivan's opinions are immaterial on account of the "sole and
13   absolute discretion" vested in First Health under the Plan.  <u>Id.</u>

14       Plaintiff notes that the Plan does not define the terms
15   "director," "manager," "supervisor," or "non-supervisor," PSOF
16   (doc. # 26) ¶ 18, but First Health maintains that this, too, is
17   immaterial by virtue of its "sole and absolute discretion" under
18   the Plan.  DSSOF (doc. # 30) ¶ 13.

19       Finally, Plaintiff contends that she was subject to blackout
20   periods for the purchase and sale of First Health stock, was
21   periodically reminded of such blackout periods throughout the term
22   of her employment, and that she did sign an insider trading
23   agreement.  PSOF (doc. # 26) ¶¶ 19-20.  First Health disputes these
24   allegations.  DSSOF (doc. # 30) ¶ 14.

25   . . .

26   _____

27       [2]  The Court does not fully appreciate the genuineness of this
     "dispute," but, in the adversarial spirit exhibited by First Health,
28   will note the matter as being hotly contested.

1   II.   **STANDARD OF REVIEW**

2        Summary judgment is appropriate "when there is no genuine

3   issue of material fact" such that "the moving party is entitled to

4   judgment as a matter of law." Fed. R. Civ. P. 56.  In determining

5   whether to grant summary judgment, a district court must view the

6   underlying facts and the inferences to be drawn from those facts in

7   the light most favorable to the nonmoving party.  See Matsushita

8   Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

9        If a party will bear the burden of proof at trial as to an

10  element essential to its claim, and fails to adduce evidence

11  establishing a genuine issue of material fact with respect to the

12  existence of that element, then summary judgment is appropriate.

13  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Not

14  every factual dispute is capable of defeating a properly supported

15  motion for summary judgment.  Rather, the party opposing the motion

16  must show that there is a genuine issue of material fact.  See

17  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A

18  factual dispute is genuine if the evidence is such that a rational

19  trier of fact could resolve the dispute in favor of the nonmoving

20  party.  Id. at 248.  A fact is material if determination of the

21  issue might affect the outcome of the case under the governing

22  substantive law.  Id.  Thus, a party opposing a motion for summary

23  judgment cannot rest upon bare allegations or denials in the

24  pleadings, but must set forth specific facts demonstrating a

25  genuine issue for trial.  See id. at 250.  If the nonmoving party's

26  evidence is merely colorable or not significantly probative, a

27  court may grant summary judgment.  See id. at 249; see also Cal.

28  Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, 818 F.2d

1  1466, 1468 (9th Cir. 1987).

2  **III. DISCUSSION**

3      First Health argues that there are no genuine issues of

4  material fact that would indicate any abuse of discretion on its

5  part in denying Plaintiff director-level benefits under the Plan,

6  and should therefore be granted summary judgment.  The Court will

7  first determine the appropriate standard of review to apply.[3]

8      **A. Standard of Judicial Review in § 1132 Actions**

9      Although ERISA creates private rights of action allowing plan

10  participants and beneficiaries to challenge benefit eligibility

11  determinations, the statute does not set out the standard of

12  judicial review for such actions.  See 29 U.S.C. § 1132.  First

13  Health's position is that "[t]he validity of [First Health's]

14  findings of fact, interpretation, construction or decision will not

15  be given a de novo review if challenged in Court . . . and will be

16  upheld unless clearly arbitrary and capricious."  DSOF (doc. # 24),

17  Ex. 2 at 6.

18

19  _____

20      [3]  First Health argues for the first time in its reply that
Plaintiff was ineligible for additional director-level benefits under
the Plan, because she did not execute a release.  Reply (doc. # 29)
21  at 2-3.  Ordinarily, the Court would not consider this argument
without providing Plaintiff an opportunity to respond.  Cf. Provenz
22  v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996) (holding that where a
party introduces new evidence in its reply brief, the district court
23  should not consider the new evidence without giving the non-movant an
opportunity to respond); Corson & Gruman Co. v. NLRB, 283 U.S. App.
24  D.C. 239, 899 F.2d 47, 50 (D.C. Cir. 1990) (requiring moving party to
raise all arguments in its opening brief to prevent "sandbagging" of
25  opposing party).   For purposes of the present motion, it is
sufficient to note that, beyond the inferences discussed in its reply
26  memorandum, First Health has not supplied any evidence that Plaintiff
has failed to execute such an agreement.  Moreover, the Committee's
27  denial of benefits letter, by discussing the terms of the new Plan,
28  suggests that a release may actually have been executed by Plaintiff.

1    Notwithstanding, the Supreme Court has stated that the
2  determination of the appropriate standard for § 1132 actions should
3  be guided by principles of trust law.  See Firestone Tire & Rubber,
4  Co. v. Bruch, 489 U.S. 101, 107-111 (1989).  Thus, if a plan
5  confers discretion on its administrator to interpret the plan's
6  terms or to make benefit eligibility determinations, the
7  administrator's decisions are entitled to deference, and are
8  reviewed for abuse of discretion.  Id. at 111-15.  Absent such
9  discretionary authority, however, courts must review the
10  administrator's decisions de novo.  Id. at 115.
11    However, even if a plan administrator has discretionary
12  authority, a court may engage in a more searching review if the
13  administrator's decision was tainted by a conflict of interest.
14  Id.  "Because the great deference accorded a plan administrator
15  arises in part from the assumption of trust law that the trustee
16  has no pecuniary interest in his decisions, proof that the trustee
17  does have such interest correspondingly strengthens the court's
18  level of review."  Boque v. Ampex Corp., 976 F.2d 1319, 1325, n.29
19  (9th Cir. 1992).  In Firestone, the Supreme Court noted that if an
20  administrator is "operating under a conflict of interest, that
21  conflict must be weighed as a factor in determining whether there
22  is an abuse of discretion."  Firestone, 489 U.S. at 115 (internal
23  quotations omitted).  The Ninth Circuit has recently clarified that
24  "Firestone . . . require[s] abuse of discretion review whenever an
25  ERISA plan grants discretion to the plan administrator, but a
26  review informed by the nature, extent, and effect on the
27  decision-making process of any conflict of interest that may appear
28  in the record."  Abatie v. Alta Health & Life Insurance Co., 458

1  F.3d 955, 967 (9th Cir. 2006) (en banc).  This standard applies to

2  the kind of inherent or structural conflict of interest that exists

3  when an insurer acts as both the plan administrator and funding

4  source for benefits.  <u>Id.</u> at 967-69.

5       "[A]buse of discretion review, with any 'conflict . . .

6  weighed as a factor,' . . . , is indefinite."  <u>Id.</u> (citation

7  omitted).  The district court must tailor the intensity of its

8  review to fit the circumstances before it.  <u>See id.</u> at 968-69.

9            The level of skepticism with which a court
            views a conflicted administrator's decision may
10           be low if a structural conflict of interest is
            unaccompanied, for example, by any evidence of
11           malice, of self-dealing, or of a parsimonious
            claims-granting history.  A court may weigh a
12           conflict more heavily if, for example, the
            administrator provides inconsistent reasons for
13           denial, . . . ; fails adequately to investigate
            a claim or ask the plaintiff for necessary
14           evidence, . . . ; fails to credit a claimant's
            reliable evidence, . . . ; or has repeatedly
15           denied benefits to deserving participants by
            interpreting plan terms incorrectly or by
16           making decisions against the weight of evidence
            in the record.

17

18  <u>Id.</u> (citations omitted).  The district court may also consider

19  "evidence that any conflict did not influence [the administrator's]

20  decisionmaking process," <u>e.g.</u>, "that it used . . . [an] independent

21  review process; that its employees do not have incentives to deny

22  claims; that its interpretations of the plan have been consistent

23  among [claimants]; or that it has minimized any potential financial

24  gain through structure of its business."  <u>Id.</u> at 969, n.7.  In

25  determining how much weight to give a conflict under the abuse of

26  discretion standard, the district court may look outside the

27  administrative record.  <u>Id.</u> at 970.

28       In the present case, there is little question that the Plan's

1  language was designed to confer the broadest discretion imaginable

2  on First Health to interpret its terms and make benefit eligibility

3  determinations.  As noted earlier, the extent of this extensive

4  power is best illustrated by the following passage:

5          If, due to errors in drafting, any Plan
           provision does not accurately reflect its
6          intended meaning, . . . as determined by the
           Plan Administrator in its sole and exclusive
7          judgment, the provision will be considered
           ambiguous and will be interpreted by the Plan
8          Administrator in a fashion consistent with its
           intent, as determined by the Plan Administrator
9          in its sole discretion.

10  See DSOF (doc. # 24), Ex. 2 at 6.  First Health's discretion under

11  the Plan is clearly sufficient for the Court to apply abuse of

12  discretion review, but also appears to invite potential abuse with

13  its liberal allowance of ambiguities as an avenue for unilateral

14  plan modification.

15      Plaintiff suggests that the Court should apply de novo review,

16  because she was allegedly never shown the Plan until after she was

17  terminated, and therefore could not have agreed to the Plan

18  Administrator's broad discretionary powers.  Resp. (doc. # 25) at

19  6-7.  Given that Plaintiff was at least aware of the Plan's

20  schedule of benefits while she was still employed by First Health,

21  as evidenced by her March 18 email to Zambrano, the Court cannot

22  accept her position, and will apply abuse of discretion review.

23      However, the Court will temper its deference to First Health's

24  decision on account of the structural conflict of interest inherent

25  to its dual capacity as plan fiduciary and administrator.  Id. at

26  7-9.  Plaintiff argues that the Court should weigh this conflict

27  more heavily due to the inconsistent reasons she was given by First

28  Health for the denial of her director-level benefits.  Id. at 8.

1  The point is well taken.  Plaintiff was a "person with the title of
2  Director" who was not "classified as 'non-supervisor' in the
3  Colleague Data Base," and by the plain meaning of the Plan would
4  appear to have been entitled to director-level severance benefits.
5  See DSOF (doc. # 24), Ex. 2 at 5.  Instead of focusing on those
6  considerations set forth in the Plan, the Committee's reasons for
7  its denial of Plaintiff's director-level benefits focus on other
8  irrelevant details such as insider trading agreements, blackout
9  periods, and Flexible Time Off.  DSOF (doc. # 24), Ex. 11.  The
10  Committee apparently did so because, "in it its sole and exclusive
11  judgment," it determined that "errors in drafting" caused the
12  Plan's schedule of benefits to "not accurately reflect its intended
13  meaning," and required the schedule to be "considered ambiguous"
14  and reinterpreted "in its sole discretion" as follows: "The Plan
15  language indicates the intent to differentiate between the level of
16  benefits awarded to a person acting at a director level with a
17  director title and someone who merely has the word 'director' in
18  their title."  DSOF (doc. # 24), Ex. 2 at 6, Ex. 11.  Absent the
19  Plan provision which purports to allow First Health to create such
20  ambiguities out of otherwise clear terms for the sole purpose of
21  reinterpreting the Plan consistent with its later determined
22  intent, the Court perceives no such intent in the Plan documents.
23  Moreover, First Health acknowledges that the National Sales
24  Director and Product Director-- positions expressly excluded from
25  director-level benefits under the Plan-- were both subject to stock
26  restrictions, yet later attempted to deny Plaintiff on the basis
27  that she was not subject to those same restrictions.  See Reply;
28  DSOF (doc. # 24), Ex. 11.  It suffices to say that First Health's

- 13 -

1  reasons for denying eligibility have been inconsistent.  The Court
2  undertakes its abuse of discretion review.

3  **B. Whether First Health Abused Its Discretion**

4  An ERISA plan administrator abuses its discretion if (1) it
5  renders a decision without any explanation, (2) it construes
6  provisions of the plan in a way that conflicts with the plain
7  language of the plan, or (3) it relies on clearly erroneous
8  findings of fact in making benefit determinations.  Taft v.
9  Equitable Life Assurance Soc'y, 9 F.3d 1469, 1472-73 (9th Cir.
10 1993).  Because an administrator cannot abuse its discretion by
11 failing to consider evidence that was never before it, the Court's
12 review is limited to evidence that was part of the administrative
13 record.  See id. at 1471-72.

14 It is apparent to the Court that there are at least genuine
15 issues of material fact from which a rational trier of fact could
16 determine that First Health abused its discretion in denying
17 Plaintiff director-level benefits under the Plan.  Although the
18 Court has determined that the abuse of discretion review in this
19 case must be undertaken with a good measure of skepticism, these
20 triable issues would exist even in the absence of such heightened
21 review.

22 First Health has arguably abused its discretion by construing
23 the provisions of the Plan in a way that conflicts with its plain
24 meaning.  Taft, 9 F.3d at 1472-73.  The plain language of the Plan
25 provides that "persons with the title of Director or titles above
26 Director" are eligible for the subject benefits.  DSOF (doc. # 24),
27 Ex. 2 at 5.  Although the primary criteria of eligibility is
28 defined in terms of the prospective beneficiary's title, the

1   Committee's denial letter to Plaintiff suggests the opposite-- that
2   the real purpose of the Plan was to "differentiate between . . . a
3   person acting at a director level with a director title and someone
4   who merely has the word 'director' in their title."  DSOF (doc.
5   # 24), Ex. 11.  Moreover, an explanatory footnote in the Plan
6   refining the eligibility criteria notes that directors classified
7   as "non-supervisor" in the Colleague Data Base are ineligible for
8   director-level benefits.  DSOF (doc. # 24), Ex. 2 at 5 n.1.
9   Plaintiff was a director whose position was <u>not</u> classified in the
10  database as "non-supervisor," yet she was denied for other reasons
11  obviously not contemplated by the plain language of the Plan.
12  Furthermore, the Court does not know what to make of First Health's
13  contention that it has no obligation to show prospective
14  beneficiaries the Colleague Data Base, <u>see</u> DSSOF (doc. # 30) ¶ 2,
15  when it claims that the classifications in that database are
16  "controlling" in determining benefit eligibility.  <u>See</u> DSOF (doc.
17   24), Ex. 11.  It may simply reflect a belief that a prospective
18  beneficiary's full and accurate understanding of the bargain
19  reflected in the Plan documents is immaterial and unnecessary given
20  First Health's broad discretion to alter those terms at any later
21  date based on what is contended to be an ambiguity.
22       In defense of its motion, First Health makes much of the fact
23  that the illustrative examples it selected for the explanatory
24  footnote in the Plan-- Medical Director, National Sales Director,
25  or Product Director-- like Plaintiff's position, were actually
26  classified in the database as "managers," not "non-supervisors."
27  Reply (doc. # 29) at 2-4, 8.  It therefore argues that its choice
28  of examples creates an ambiguity requiring interpretation.

1   Curiously, however, First Health's interpretation imbues mere
2   examples in a footnote with more determinative weight than the
3   substantive phrases they were meant to illustrate.  This unusual
4   manner of interpretation is insufficient to dispel the genuine
5   issues of material fact concerning the question of whether First
6   Health abused its discretion in denying Plaintiff benefits.
7        First Health's interpretive efforts have strained the plain
8   meaning of the Plan.  As the Court alluded above, the Plan's
9   eagerness to confer sweeping discretion on the administrator nearly
10  invites such abuse by allowing the administrator, "in its sole and
11  exclusive judgment," to cure "errors in drafting" by unilaterally
12  "consider[ing] [them] ambiguous," and reinterpreting them "in a
13  fashion consistent with its intent, as determined by the Plan
14  Administrator in its sole discretion."  DSOF (doc. # 24), Ex. 2 at
15  6.  This free license to unveil the Plan's hidden meanings by
16  rewriting its terms is offensive to contractual principles of
17  mutual assent and impermissible under ERISA.  <u>See</u> <u>Saffle v. Sierra</u>
18  <u>Pac. Power Co. Bargaining Unit Long Term Disability Income Plan</u>, 85
19  F.3d 455, 460 (9th Cir. 1996) ("[A]n administrator lacks discretion
20  to rewrite the Plan.").

21  **IV.   CONCLUSION**

22       In light of the foregoing analysis,

23       IT IS ORDERED that Defendants' motion for summary judgment

24  (doc. # 23) is DENIED.

25       DATED this 24th day of July, 2007.

26
27
28
                         _____
                         Robert C. Broomfield
                         Senior United States District Judge

1   Copies to counsel of record

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28